## A04A0465. SALGADO v. THE STATE.
(601 SE2d 417)

MIKELL, Judge.

After a jury trial, Israel Mojica Salgado was convicted of trafficking in cocaine and possessing cocaine. Salgado was sentenced to thirty years on the trafficking charge (twenty to serve) and ten years on the possession charge (five to serve), to run consecutively. On appeal, Salgado argues that the use of a magistrate judge in his trial violated the Georgia Constitution, that the evidence was insufficient to support his convictions, and that the trial court erred by denying his motions for a mistrial, for severance, and for directed verdict as to the trafficking charge. Finding no error, we affirm.

"On appeal from a criminal conviction, the evidence must be viewed in the light most favorable to support the verdict, and [Salgado] no longer enjoys a presumption of innocence."[1] Further, "[w]e do not weigh the evidence or determine witness credibility but only determine whether the evidence is sufficient under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[2]

So viewed, the evidence shows that in March 1999, Marietta-Cobb-Smyrna narcotic agents Donald Minter, Miguel Rivera, Perry Dulworth, and Jeff DaRin set up an undercover operation at a bar in Smyrna after learning that drugs were being sold at the bar. On March 17, Agent Rivera testified that he approached two men at the bar, Jose Uriostegui[3] and Mario Calamaries, introduced himself as "Rico," and "told 'em we were from out of town in Tennessee, working on construction, and we were trying to establish a point of contact for someone to sell us some weed." Uriostegui replied that they had access to cocaine and to give him ten or fifteen minutes, then follow him to his house. Rivera and Minter followed the men to nearby Windsor Lake Apartments, where Rivera gave Uriostegui $100 of marked funds in exchange for 2.4 grams of cocaine. Uriostegui told Rivera, "This is real good stuff. There's a lot more where this came from. . . . If you want more, you need to call me and I'll hook you up." Rivera took Uriostegui's home and work phone numbers and gave Uriostegui his pager number.

Rivera testified that he arranged two more cocaine purchases from Uriostegui within the next several days. On March 23, Rivera and Dulworth met Uriostegui at his place of employment and arranged to purchase $300 worth of cocaine. They met again at the bar, and Rivera purchased five packets of cocaine, weighing 5.1 grams, from Uriostegui for $320. On March 25, Rivera went to Uriostegui's place of employment to discuss purchasing two ounces of cocaine. Again, they arranged to meet at the same bar. Rivera purchased two bags of cocaine, weighing 56.1 grams, from Uriostegui for approximately $1,700. Rivera testified that Uriostegui advised him that he could get him a kilo of cocaine for $22,000.

---

[1] (Citations and punctuation omitted.) *Jackson v. State*, 252 Ga. App. 268 (1) (555 SE2d 908) (2001).

[2] (Citations omitted.) *Dixon v. State*, 252 Ga. App. 385 (556 SE2d 480) (2001).

[3] Uriostegui was Salgado's co-defendant. The court reporter spelled his name as "Uriostequi," but the indictment shows his name to be "Uriostegui." Uriostegui and Salgado were jointly charged with trafficking in cocaine in Count 4 of the indictment. Counts 1 through 3 charged only Uriostegui, and Count 5 charged Salgado with possession of cocaine.

On March 30, Rivera contacted Uriostegui again at his place of employment and requested a meeting at the bar so that Minter, whom Rivera referred to as his "boss," could talk to Uriostegui. At approximately 9:00 that evening, they met in the bar's parking lot in Minter's truck. Minter sat in the driver's seat, Uriostegui in the passenger seat, and Rivera and DaRin in the back seat. Rivera, interpreting for Minter, told Uriostegui that they were happy with the purchases thus far and showed him a cooler that contained $22,000, to indicate their seriousness about purchasing the kilo. Uriostegui said that he could only provide 14 ounces, which would cost $12,375, and that he would have to talk to a friend to supply more.

Uriostegui paged Rivera on March 31 to arrange to sell him 15 ounces of cocaine. Uriostegui called Rivera before they met on April 1 to advise that he only had access to 14 ounces, which he would sell for $825 per ounce. Rivera and his unit determined that they would arrest Uriostegui during this transaction. They set up a "buy bust" operation to do so, meaning that Rivera would be wired, surveillance would be utilized, and several other officers would be present.

On the evening of April 1, Uriostegui arrived at the bar with appellant Salgado, whom he introduced as the friend he had spoken about earlier. Salgado led the discussion about the details of the drug transaction. Salgado and Rivera agreed that the sale would occur at a restaurant. The agents drove Salgado and Uriostegui to Windsor Lake Apartments and gave Salgado a cooler in which to place the cocaine. Rivera explained that the money would be in a similar cooler and instructed Salgado that they would exchange the drugs for the money in a 30-second transaction.

Salgado and Uriostegui arrived at the restaurant in the back seat of a white taxi cab. Rivera exited his vehicle, grabbed the cooler, walked toward the taxi cab, and observed the cooler that he had given Salgado sitting between Salgado and Uriostegui. Rivera told Salgado to open the cooler so that he could see the drugs, and Salgado complied. As Rivera walked away from the taxi cab, he gave his unit the takedown signal and they surrounded Rivera and the taxi cab. Rivera, Salgado, and Uriostegui were arrested.

Salgado and Uriostegui were taken from the scene, then Rivera was released. Inside the cooler were 14 bags of cocaine, weighing 397 grams. The purity of the cocaine tested from eight of the fourteen bags was 44 percent. The officer who arrested Salgado testified that he found an additional 2.2 grams of cocaine in Salgado's left front pants pocket.

1. In his first enumeration of error, Salgado argues that the magistrate judge who presided over his trial was not authorized to do so. He contends that the magistrate had been designated to assist the

superior court for a term of a year, in violation of the Georgia Constitution and OCGA § 15-1-9.1 (b) (2) and (f). We disagree.

OCGA § 15-1-9.1 (b) (2) authorizes the chief judge of any court to make a written request for assistance from a judge in the same county. OCGA § 15-1-9.1 (f) provides, in pertinent part,

> [t]he written designation shall identify the court in need of assistance, the county where located, the time period covered, the specific case or cases for which assistance is sought if applicable, and the reason that assistance is needed. The written designation shall be filed and recorded on the minutes of the clerk of the court requesting assistance. Any amendment to the designation shall be written, filed, and recorded as is the original designation.

Relying on *Massey v. State*,[4] Salgado argues that the orders designating magistrate judges to assist superior court judges must be limited in duration, pursuant to OCGA § 15-1-9.1 (f). However, in *Lewis v. McDougal*,[5] the Supreme Court held that subsection (f) "applies only when the request is for a judge outside the county"[6] and disapproved *Massey* to the extent that it required intra-county designation orders to comply with subsection (f).[7]

2. Next, Salgado argues that his motion for mistrial should have been granted after the state's witness placed Salgado's character in issue.

"Whether to grant a mistrial based on improper character evidence is within the discretion of the trial judge. In reviewing the trial court's decision, an appellate court may consider the nature of the statement, the other evidence in the case, and the court's and counsel's actions in dealing with the impropriety."[8] The testimony about which Salgado complains was given by Rivera and is as follows:

> Q. Why don't you want to do a — get in this situation and do a deal before you are ready to?
> A. The main factor's officer safety. Every, single deal that we have, I have to sit in front of agents. I have to brief agents. I have to tell agents this is going to happen, this date. These are the bad guys that are expected to show up. We can't do

---

[4] 265 Ga. 632 (458 SE2d 818) (1995).

[5] 276 Ga. 861 (583 SE2d 859) (2003).

[6] Id. at 862 (1).

[7] Id. at 862 (1), n. 1.

[8] (Citation and punctuation omitted.) *Burns v. State*, 236 Ga. App. 3, 6 (3) (510 SE2d 865) (1999).

anything on the spur of the moment. It's not going to happen that way. We have to plan it out ready. We have to have everything in place. Then the deal goes down when we are ready for it. We can't let the bad guy direct it.

Salgado objected to Rivera's use of the term "bad guys." The trial court sustained the objection, after noting that the term had been used earlier with no objection. The trial court then denied Salgado's motion for a mistrial and gave curative instructions to the jury to disregard the officer's statement.

In the testimony at issue, Rivera was explaining the reason why undercover operations have to be planned to the agents' advantage. He had not yet testified about Salgado's involvement in the drug sale. We cannot find that the use of the term "bad guys" in this manner improperly injected Salgado's character into evidence.[9] However, even assuming, arguendo, that the comment was improper, reversal of Salgado's conviction is not warranted. "When error is found, the inquiry becomes whether harm occurred. And the test for determining harmless error is whether it is highly probable that the error did not contribute to the judgment."[10] In light of the overwhelming evidence of Salgado's guilt, we cannot find that any error occurring from the use of the term "bad guys" contributed to the verdict.

3. Salgado contends that the trial court erred by failing to sever his case from Uriostegui's case. We disagree.

"[T]he severance of defendants' trials is within the sound discretion of the trial court and its decision will not be disturbed unless there is an abuse of that discretion."[11] In exercising its discretion, the trial court must consider:

(1) whether the number of defendants will create confusion as to the evidence and the law applicable to each, (2) whether there is a danger that evidence admissible against one defendant will be considered against the other despite the court's instructions, or whether the strength of the evidence against one defendant will engulf the other with a "spillover"

---

[9] See generally *Meaux v. State*, 176 Ga. App. 345 (1) (335 SE2d 741) (1985) (testimony that persons frequenting the Sundown Lounge (where defendant allegedly sold the agent the marijuana) are there for two things, either the older set are playing checkers or they are selling some drugs, did not improperly inject defendant's character into evidence).

[10] (Citation and punctuation omitted.) *Kitchens v. State*, 235 Ga. App. 349, 352 (1) (509 SE2d 391) (1998).

[11] (Citation omitted.) *Moore v. State*, 261 Ga. App. 752, 753 (1) (583 SE2d 588) (2003).

effect, and (3) whether the defendants' defenses are antagonistic to each other or to each other's rights.[12]

In support of his motion to sever, "the defendant requesting the severance [must] do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing of prejudice and a consequent denial of due process,"[13] which Salgado has not done.

Salgado argues that their cases should have been severed because of the overwhelming amount of evidence against Uriostegui and because Uriostegui faced three additional charges. However, Salgado made no argument that there was a confusion of law or facts, that the evidence against Uriostegui had a "spillover" effect, or that his defense was antagonistic to Uriostegui's. Accordingly, the trial court did not abuse its discretion by denying Salgado's motion.

4. In his last two enumerations of error, Salgado argues that the trial court erred by denying his motion for directed verdict as to Count 4 and that the evidence was insufficient to support his convictions. Again, we disagree.

"The standard of review for the denial of a motion for directed verdict of acquittal is the same as that for reviewing the sufficiency of the evidence to support a conviction."[14] As stated earlier, we view the evidence in the light most favorable to the jury's verdict and must uphold the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[15]

(a) *Trafficking in cocaine.* OCGA § 16-13-31 (a) (1) provides, in pertinent part, that "[a]ny person who knowingly sells, manufactures, delivers, or brings into this state or who is knowingly in possession of 28 grams or more of cocaine or of any mixture with a purity of 10 percent or more of cocaine, as described in Schedule II, in violation of this article commits the felony offense of trafficking in cocaine." The evidence established that Salgado arranged the drug transaction with Rivera, accepted the container in which Rivera directed him to place the cocaine, and delivered to Rivera 397 grams of cocaine with a purity of 44 percent. Thus, it was sufficient to support Salgado's conviction for this offense. Salgado argues that the evidence did not exclude every reasonable hypothesis other than his guilt but asserts no other hypothesis in his appellate brief.

---

[12] (Citations omitted.) *Stephens v. State*, 245 Ga. App. 823, 827 (8) (538 SE2d 882) (2000).

[13] (Citation omitted.) *Stevens v. State*, 210 Ga. App. 355, 356 (2) (436 SE2d 82) (1993).

[14] (Citation omitted.) *Tahantan v. State*, 260 Ga. App. 861 (581 SE2d 373) (2003).

[15] *Dixon*, supra.

(b) *Possession of cocaine.* Pursuant to OCGA § 16-13-30 (a), "it is unlawful for any person to purchase, possess, or have under his control any controlled substance." Cocaine is considered to be a controlled substance.[16] The evidence shows that after Salgado and Uriostegui were arrested in connection with the undercover operation, an additional 2.2 grams of cocaine was found in Salgado's left front pants pocket. This evidence was sufficient to support Salgado's conviction for possession of cocaine.

*Judgment affirmed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED JUNE 18, 2004.

*Robert H. Alexander III*, for appellant.
*Patrick H. Head, District Attorney, Amelia G. Pray, Samuel W. Lengen, Assistant District Attorneys*, for appellee.